IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


LEGENDARY ART, LLC            :            CIVIL ACTION
                                          :
            v.                            :
                                          :
MICHAEL GODARD, et al.        :            NO. 11-0674


**MEMORANDUM AND ORDER**

Plaintiff in this case, Legendary Art, LLC ("Legendary Art"), brings claims of breach of

contract and unjust enrichment against Defendants Michael Godard ("Godard"), Michael Godard

Fine Art Enterprises, Inc. ("MGFA Enterprises"), Michael Godard Fine Art Associates ("MGFA

Associates"), and Michael Godard LLC ("MG LLC").  Presently before the Court are

Defendants' Motion for Summary Judgment (Doc. 36), Plaintiff's Response in Opposition to

Defendants' Motion for Summary Judgment (Doc. 39), Defendants' Reply Brief in Support of its

Motion for Summary Judgment (Doc. 42), and Plaintiff's Sur-reply (Doc. 45).  After considering

the briefing, along with the arguments presented at the hearing on July 27, 2012, for the reasons

stated herein, Defendants' motion will be granted in part and denied in part.

I.      **FACTUAL BACKGROUND**

Legendary Art was in the business of creating and marketing framed wall decor for

commercial and residential purposes in both the retail and wholesale markets.  (Sec. Am. Compl.

¶ 12.)  Its focus was on sports, entertainment, and recreation themed artwork and novelty

products.  (Defs.' Facts ¶ 10; Pl.'s Resp. to Defs.' Facts ¶ 10.)  During the events in question,

Joel Fink ("Fink"), Neil Caplen, both "members" of the Legendary Art, and Larry Caplen, who

was employed with the company, communicated with the Defendants on behalf of Legendary Art.  (Defs.' Facts ¶¶ 2-3, 5; Pl.'s Resp. to Defs.' Facts ¶¶ 2-3, 5.)

Michael Godard is an artist whose works include alcohol and party themed paintings. (Defs.' Facts ¶ 12; Pl.'s Resp. to Defs.' Facts ¶ 12.)  MGFA Enterprises and MGFA Associates are Nevada corporations formed in January 2007.[1]  (Defs.' Facts ¶¶ 14, 15; Pl.'s Resp. to Defs.' Facts ¶¶ 14, 15.)  MG LLC is a Nevada limited liability company formed in 2007.  (Defs.' Facts ¶ 16; Pl.'s Resp. to Defs.' Facts ¶ 16.)  At all times relevant to this dispute, Michael Godard was an officer/member of MGFA Enterprises, MGFA Associates, and MG LLC in varying capacities and held varying ownership interests in each entity.  (Defs.' Facts ¶ 17; Pl.'s Resp. to Defs.' Facts ¶ 17.)  During the relevant time period, Brandon Donofrio ("Donofrio") was employed to license and sell Godard artwork.  (Defs.' Facts ¶ 20; Pl.'s Resp. to Defs.' Facts ¶ 20; Donofrio Dep. 59:6-61:25, Oct. 12, 2011.)

In late 2006, Legendary Art created the concept of incorporating posters of Godard artwork into "shadow boxes" that would surround the image with three dimensional objects. (Defs.' Facts ¶ 21; Pl.'s Resp. to Defs.' Facts ¶ 21.)  Sometime in late 2006 or early 2007, Fink spoke via telephone to Godard regarding the shadow box idea, and Godard introduced Fink to Donofrio.  (Defs.' Facts ¶¶ 22-23; Pl.'s Resp. to Defs.' Facts ¶¶ 22-23; Sec. Am. Compl. ¶¶ 19-20.)  In late January 2007, Fink, Larry Caplen and Neil Caplen traveled to Las Vegas.  (Defs.' Facts ¶ 24; Pl.'s Resp. to Defs.' Facts ¶ 24.)  They met with Godard and Donofrio and presented prototypes of the shadow boxes.  (Id.)

---

[1] MGFA Enterprises was dissolved in 2010.  (Defs.' Facts ¶ 14; Pl.'s Resp. to Defs.' Facts ¶ 14.)

2

Shortly after returning to Philadelphia from Las Vegas, Fink, with Larry Caplen present, called Godard.  (Fink Dep. 83:19-23; 87:12-88:2, Sept. 12, 2011.)  The content of this conversation is in dispute: Legendary Art alleges that an oral contract was formed in which Godard agreed to personally perform certain marketing and promotional activities (the "Personal Performance Obligations"); Godard does not recall the specific content of the call and contends that the conversation was merely a part of the ongoing negotiations between the parties.

Subsequently, Donofrio sent Legendary Art a document entitled "Michael Godard Fine Art Enterprises, Inc. Deal Memorandum Worksheet" (the "Deal Memorandum").  (Defs.' Ex. J.)  The Deal Memorandum included the following material terms:

a.      Legendary Art was identified as the "Licensee";

b.      the property to be licensed was identified as "Only Godard Posters that are current";

c.      the products to be manufactured were "Godard Component Shadow Box Framing for Godard Poster Art";

d.      the consideration was "$10,000 Upon Signing this agreement" and "$8,000 Monthly payments of $800 starting March 15th";

e.      the term of the agreement was three years "with two extensions";

f.      the royalty rate was "10%"; and

g.      the territory was identified as "USA."

(Id.)  Finally, the Deal Memorandum contained the following language: "This is a binding contract and will proceed to a formal contract after the above terms have been accepted."  (Id.) The Deal Memorandum was signed on behalf of Legendary Art on February 8, 2007 (id.), and an

advance royalty check of $10,000 was sent to MGFA Enterprises (Defs.' Facts ¶ 36; Pl.'s Resp. to Defs.' Facts ¶ 36). Thereafter, Legendary Art began the manufacture and sale of shadowboxes containing Godard artwork. (Defs.' Facts ¶ 37; Pl.'s Resp. to Defs.' Facts ¶ 37.)

In on March 14, 2007, Donofrio sent Fink a draft of a more comprehensive licensing agreement for Legendary Art's review, listing MGFA Enterprises as the licensor. (Defs.' Ex. L.) The agreement contained expanded terms about ownership of intellectual property, sales reporting requirements, provisions for termination and default, and other standard license agreement terms. (Id.) The draft also contained an integration clause, which stated that the agreement was to be the "completed understanding and agreement of the parties with respect to the subject matter." (Id.)

On April 27, 2007, Donofrio emailed Fink stating that the advance royalty check of $10,000 was being returned to Legendary Art and that a new check would need to be made out to MGFA Associates. (Sec. Am. Compl. Ex. 4.) The email identified MGFA Associates as "the company that you guys license the artwork from," and instructed that "[a]ll checks for licensing go to this company." (Id.) Donofrio further indicated that "[t]he contract once we receive it back, will be also in Michael Godard Fine Art Associates [sic]." (Id.)

On May 30, 2007, Legendary Art returned a markup of the draft agreement containing proposed revisions. (Defs.' Exs. M, N.) Legendary Art's markup did not include any of the Personal Performance Obligations allegedly promised by Godard during the phone call with Fink and Larry Caplen and did not alter the integration clause. (Defs.' Ex. N.) During these negotiations, Legendary Art continued manufacturing and selling Godard shadowboxes under the terms of the Deal Memorandum.

4

Sometime in the summer of 2007, the relationship between Legendary Art and the Defendants began to deteriorate.  Donofrio, Legendary Art's primary contact with Godard and his associated entities, left Godard's employ.  (Godard Dep. 321:23 - 322:2, Oct. 12, 2011.)  The evidence is disputed as to what happened next.  Beginning in late July 2007, Fink sent a series of increasingly desperate correspondences to Donofrio, and then to Godard himself, in an attempt to finalize the licensing agreement and address other issues.  (Pl.'s Exs. 37-42.)  Godard testified that he never received any of Fink's correspondence, and that the fax numbers, phone numbers, and addresses Fink used were incorrect.  (Godard Dep. 215:5 - 222:21, Oct. 11, 2011.)  Both sides agreed that there was no further communication between Godard or anyone from the Godard entities and Legendary Art.

In 2008, Fink, who had been financing Legendary Art's business, decided not to continue investing in the company due, he testified, to the failed relationship with Godard and the lack of return on his investment.  (Fink Dep. 158:6-160:10.)  The parties dispute whether Legendary Art ceased to operate shortly thereafter, or whether it continued to operate under a new name.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Levy v. Sterling Holding Co. LLC, 544 F.3d 493, 501 (3d Cir. 2008).  Only a factual dispute that is both genuine and material will defeat a motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986).  A factual dispute is "genuine" if the evidence is such that a reasonable jury could possibly return

a verdict for the non-movant.  Id. at 248.  A dispute is "material" if it would affect the outcome of the case under governing substantive law.  Id.

The moving party bears the initial burden to demonstrate that there are no facts on record that support the non-moving party's position.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the moving party carries this burden, the non-moving party must then present specific facts showing the existence of a genuine issue for trial.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986).  At the summary judgment stage, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-movant.  See Matsushita, 475 U.S. at 587.  However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586.  The non-moving party cannot rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

## III.   DISCUSSION

Defendants seek summary judgment in their favor on both counts in the Second Amended Complaint, for breach of contract and unjust enrichment.

As to the first count, Legendary Art alleges breach of two contracts.  First, it alleges that all the Defendants breached the Deal Memorandum.  Defendants argue that Legendary Art has not offered evidence of any conduct on the part of the Defendants that would constitute a breach of the Deal Memorandum.  Additionally, Defendants argue that the Deal Memorandum was between Legendary Art and MGFA Enterprises, and thus, all other Defendants must be dismissed as non-parties to the contract.  Second, Legendary Art alleges that the Personal Performance

Obligations were a separate oral contract that was breached by defendant Michael Godard.  As an initial matter, the parties disagree over the burden of proof applicable to Legendary Art's oral contract claim – Legendary Art argues that the 'preponderance of the evidence' standard applies, while Defendants urge this court to apply the higher 'clear and precise' standard.  Defendants further argue that the Personal Performance Obligations do not constitute an enforceable oral contract under either burden of proof, and, in the alternative, that the parole evidence rule operates to bar evidence of the alleged oral contract because of the existence of the written Deal Memorandum.

Additionally, with regards to both contracts, Defendants argue that Legendary Art's breach of contract claims must fail because Legendary Art cannot establish damages.  Defendants argue that Legendary Art's damages theory, namely the valuation of Legendary Art's business, is flawed because a plaintiff may not recover valuation damages for an ongoing concern.  Legendary Art disputes Defendants' characterization of its business as ongoing.  Defendants also argue that the failure of Legendary Art's business was not a foreseeable result of the breach of one contract with one of Legendary Art's licensors.  Finally, Defendants argue that the exclusion of Legendary Art's damages expert, which is the subject of a separate motion, would preclude Legendary Art from proving their damages.

As to the second count, Defendants argue that Pennsylvania law prohibits Legendary Art from bringing an unjust enrichment claim when there exists a written contract.  Defendants argue that an unjust enrichment claim is an inappropriate alternative to Legendary Art's oral contract claim because Legendary Art has failed to offer evidence that Godard benefitted in any way at Legendary Art's expense.

A.      **Breach of Contract Claim**

        1.     *The Deal Memorandum*

Under Pennsylvania law, a breach of contract claim requires a plaintiff to prove (1) the

existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages.

Szymanski v. Sacchetta, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012).  Here, the parties agree

that the Deal Memorandum constituted a valid contract.  Defendants argue, however, that there is

no evidence that any term in the Deal Memorandum was ever breached.  Defendants further

argue that, because the Deal Memorandum was entered into by Legendary Art and MGFA

Enterprises only, Defendants Michael Godard, MGFA Associates, and MG LLC must be

dismissed.  Finally, Defendants argue that Legendary Art cannot prove damages which resulted

from the alleged breach.

        a.     Breach of the Deal Memorandum

Neither party disputes that the Deal Memorandum is a valid contract.  Defendants,

however, argue that no conduct on the part of the Defendants constitutes a breach of the Deal

Memorandum.  They claim that, based on the text of the Deal Memorandum, that "the only

possible breach of contract could have resulted from a refusal to license all Godard Posters that

were 'current.'" (Defs.' Mot. 6.)  Legendary Art argues that personal approval from Godard of

every shadowbox prototype was required under the contract, and have presented evidence to that

effect, including correspondence from Donofrio and documentation regarding "approval

procedure" and "approval forms."  (Sec. Am. Compl. Ex. 1.)  Moreover, there is evidence that,

on at least one occasion, Legendary Art sought approval of shadowboxes and received no

response, which supports Legendary Art's contention that Godard unreasonably withheld

approval in breach of the contract.  (Mot. Summ. J. Hr'g Tr. 83-85.)  Finally, Legendary Art argues that, by cutting off all communication with Legendary Art, Godard breached the Deal Memorandum contract that had a term of three years.

Although Defendants stop short of conceding that approval was required under the contract (Hr'g Tr. 81), they do admit that, during the telephone conversation prior to the drafting of the Deal Memorandum, Godard had reserved the right to approve each shadow box and marketing materials personally (Defs.' Answer ¶ 24).  Defendants further claim that approval was never withheld, and there is likewise testimony supporting their position.  (Hr'g Tr. 82-83.)

Thus, there are fact issues, both in terms of the scope of the Deal Memorandum contract and the existence of a breach, that must be resolved by the trier of fact.  Therefore, the issue of whether the Deal Memorandum was breached is not appropriate for summary judgment.

### b.      Parties to the Deal Memorandum

Defendants point out that the Deal Memorandum was entered into by MGFA Enterprises and Legendary Art, only.  They therefore request summary judgment in favor of defendants MG LLC, MGFA Associates, and Michael Godard individually, because, as non-parties to the agreement, these defendants cannot be held liable for a breach.  Legendary Art seeks to pierce the corporate veil and hold all the defendants liable for any breach.  The court will reserve ruling on this issue until after the jury determines the issue of liability.

### c.      Proof of Damages

Legendary Art asserts that as a result of Defendants' breach, Legendary Art went out of business.  It claims damages based on a valuation of its projected earnings had the breach not occurred.  Defendants make two arguments regarding Legendary Art's alleged damages.  First,

9

Defendants contend that the demise of Legendary Art was not a foreseeable consequence of a breach.  Second, Defendants allege that Legendary Art did not in fact go out of business, and that valuation damages are inappropriate when the subject business is ongoing.

Under Pennsylvania law, parties who attempt to collect damages in a breach of contract dispute must be able to prove that the losses sustained "were reasonably foreseeable and within the contemplation of the parties at the time they made the contract."  Ferrer v. Trs. of the Univ. of Pa., 573 Pa. 310, 341 (2002), (quoting Taylor v. Kaufhold, 368 Pa. 538 (1951)).  Defendants assert that the total collapse of Legendary Art was an unforeseeable consequence of a breach given that the Deal Memorandum represented "only a small portion of Legendary Art's business" and the agreement with the parties was completed with "the near absence of 'negotiations.'" (Defs.' Mot. to Exclude Expert 27-28.)  Legendary Art argues that the demise of the company as a result of the breach was foreseeable, as evidenced by Godard's stated belief that the "deal was worth millions."  (Pl.'s Memo in Opp. to Defs.' Mot. to Exclude Expert 52.)  Defendants respond that Godard's statement was nothing more than the boast of an artist excited about an opportunity, instead of the sincere words of a knowledgeable businessman.  (Defs.' Reply in Support of Mot. to Exclude Expert 6 n.4.)

The positions advanced by the parties require weighing the evidence and determining the credibility of the parties' witnesses.  As such, the issue of whether a breach of the Deal Memorandum could have foreseeably resulted in the collapse of Legendary Art's business is an issue that must be decided by the trier of fact.

Likewise, the state of Legendary Art's business is a fact issue.  Defendants' argue that the valuation of a business is an inappropriate measure of damages for an ongoing concern.  They

point to deposition testimony of Legendary Art's corporate representative, in which he stated that the company had made approximately $75,000 in sales in 2011, two years after the firms alleged death. (Hr'g Tr. 48-51.) Legendary Art points to evidence that the company sold its assets, and cites seemingly conflicting testimony by the same corporate representative to the effect that the company no longer conducted any business. (Hr'g Tr. 36-37.) The appropriateness of Legendary Art's damages model cannot be determined until the issue of whether Legendary Art continued in business after the breach is resolved. Because the issue of whether Legendary Art was out of business requires weighing the facts, it must be determined by the jury.

Finally, Defendants argue that if Legendary Art's damages expert is excluded, it cannot prove its damages and summary judgment must be granted in Defendants' favor. Although the court finds that Legendary Art's expert must be excluded,[2] this does not mean that Legendary Art could not prove damages. Legendary Art may still establish its damages via evidence of its sales or of the time and money expended by its members in reliance on the Deal Memorandum. See JMJ Enter., Inc. v. Via Veneto Italian Ice, Inc., 1998 WL 175888, at *4 (E.D. Pa. Apr. 15, 1998). Therefore, summary judgment is inappropriate on Legendary Art's claim for breach of the Deal Memorandum.

---

[2] See Memorandum and Order on Defendants' Motion to Exclude Expert, filed concurrently with this opinion.

2.     *The Personal Performance Obligations*

a.     Burden of Proof for Oral Contracts

"The burden of proving the existence of a contract lies with the party relying on its

existence." Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996).  As an initial

matter, the parties disagree on the burden of proof to be applied to Legendary Art's claim for

breach of an oral contract.  Godard contends that Legendary Art must prove that the contract was

"clear and precise," while Legendary Art argues that the court must apply the preponderance of

the evidence standard.  The Pennsylvania Supreme Court has not decided which standard of

proof applies when proving the existence of an oral contract.  See Robert Billet Promotions, Inc.

v. IMI Cornelius, Inc., 1998 WL 721081, at *13 (E.D. Pa. Oct. 14, 1998) (citing Pinizzotto v.

Parsons Brinkerhoff Quade & Douglas, Inc., 697 F. Supp. 886, 886 (E.D. Pa. 1998)).  Defendants

correctly point out that the majority of decisions in this District apply the higher "clear and

precise" standard.  See, e.g., Gnames Advantage, L.P. v. CPC Assocs., Inc., 2002 WL 31750209,

at * 3 (E.D. Pa. Nov. 22, 2002) ("[t]o establish an oral contract for services, Pennsylvania law

requires clear and precise evidence"); Martin v. Safeguard Scientifics, Inc., 17 F. Supp. 2d 357,

368 (E.D. Pa. 1998) (under Pennsylvania law, plaintiff must prove oral contract by "clear and

precise evidence"); Richardson v. John F. Kennedy Mem'l Hosp., 838 F. Supp. 979, 987 (E.D.

Pa. 1993) ("Under Pennsylvania law, a plaintiff bears the burden of establishing the existence

and terms of an oral contract by clear and precise evidence.").

In response, Legendary Art points to several cases in this District have concluded that the

preponderance of the evidence standard applies to garden variety oral contracts.  See Robert

Billet Promotions, 1998 WL 721081, at *13; Zielonka v. Temple Univ., 2001 WL 1231746, at *9

12

(E.D. Pa. Oct. 12, 2001); <u>Quandry Solutions Inc. v. Verifone Inc.</u>, 2009 WL 997041, at *6 (E.D.

Pa. Apr. 13, 2009). These cases reason that Pennsylvania courts apply the higher "clear and

precise" standard to certain discrete types of oral contracts, like contracts to make a will, or oral

modifications to a written contract, but apply the preponderance of the evidence standard to run-

of-the-mill oral contracts. See <u>Robert Billet Promotions</u>, 1998 WL 721081, at *13; <u>Quandry</u>

<u>Solutions</u>, 2009 WL 997041, at *6.

   This court need not determine the proper burden of proof at this stage, because the

alleged oral contract fails even under the less onerous preponderance of the evidence standard.

      b.  <u>Elements of an Enforceable Contract</u>

   "The elements of an enforceable contract under Pennsylvania law are: (1) a manifestation

of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an

agreement supported by adequate consideration." <u>Szymanski v. Sacchetta</u>, 2012 WL 246249, at

*4 (E.D. Pa. Jan. 26, 2012) (citing <u>Johnson the Florist, Inc. v. Tedco Constr. Corp.</u>, 441 Pa.

Super. 281, 675 A.2d 511, 516 (Pa. Super. 1995). The question of whether an undisputed set of

facts establishes a contract is typically one of law, but where the facts are in dispute, the question

is for the jury to decide. <u>Id.</u> (citations omitted).

   The first element, mutual intent to be bound by an agreement, usually manifests as "'an

offer or proposal by one party followed by an acceptance by the other party.'" <u>Bayliss-Allen v.</u>

<u>Cadence Design Sys., Inc.</u>, 2000 WL 1156857, at *6 (E.D. Pa. Aug. 16, 2000) (quoting

Restatement (Second) of Contracts § 22(1) (1981)). In ascertaining intent, the object of the

inquiry is not the parties' subjective intent, but rather "the intent a reasonable person would

apprehend in considering the parties' behavior." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584

F.3d 575, 582 (3d Cir. 2009).  In the case of oral contracts, "'courts must look to surrounding

circumstances and course of dealing between the parties in order to ascertain their intent.'"

Szymanski, 2012 WL 246249, at *4 (quoting Boyle v. Steiman, 429 Pa. Super. 1, 631 A.2d 1025,

1033 (Pa. Super. 1993).

As to the second element, sufficiently definite terms, Pennsylvania has adopted the

Restatement (Second) of Contracts, see Reed v. Pittsburgh Bd. of Pub. Educ., 862 A.2d 131, 135

(Pa. Commw. Ct. 2004), which states:

> (1) Even though a manifestation of intention is intended to be understood as an offer,
> it cannot be accepted so as to form a contract unless the terms of the contract are
> reasonably certain.
>
> (2) The terms of a contract are reasonably certain if they provide a basis for
> determining the existence of a breach and for giving an appropriate remedy.
>
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain
> may show that a manifestation of intention is not intended to be understood as an
> offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981).  "Incompleteness of terms is one of the primary

reasons statements of preliminary negotiations are not deemed offers."  Reed, 862 A.2d at 135

(citing Restatement (Second) of Contracts § 33 cmt. c (1979)).

### c.    Enforceablity of the "Personal Performance Obligations"

Legendary Art alleges that, during the telephone conversation between Godard, Fink, and

Larry Caplen that took place after Fink and Caplen returned from Las Vegas, Godard agreed that

"upon [Legendary Art's] acceptance of the licensing offer," Godard would:

> a.    Sign[] limited editions of shadow box products to enhance the value of
> Legendary Art's products;
>
> b.    Tell[] all his friends and business associates about the shadow box products;

14

c.      Promot[e] the shadow box products to celebrities with whom he had personal friendships, such as Arnold Schwarzenegger;

d.      Plac[e] the shadow box products in the Oh My Godard Galleries;

e.      Plac[e] the shadow box products with dealers who were authorized Godard dealers throughout the United States and Canada;

f.      Orally promot[e] the shadow box products and signing the shadow box products during special events throughout the United States and Canada, such as personal appearances and signing events at galleries; and

g.      Creat[e] entree to cruise operator(s) with whom Godard had exclusive and non-exclusive business relations.

(Sec. Am. Compl. ¶ 26.)

The evidence that Legendary Arts offers in support of these allegations consist of the deposition testimony of Fink and Larry Caplen, as well as Legendary Art's answers to interrogatories.  Fink testified that he had a ten to twenty minute phone conversation with Godard, the purpose of which was to "solidify the relationship with Michael [Godard] and [confirm] what Brandon [Donofrio] was authorized to do."  (Fink Dep. 87:15-18, 84:9-18.)  Fink testified that Godard confirmed that "Brandon [Donofrio] is the man, deal with him" and then "started telling [Fink] all the things he was going to do for us when we signed the licensing agreement."  (Id. at 84:20-85:2.)  Fink testified that Godard said, "I know Arnold Schwarzenegger and I'm a celebrity, and I sign things, they go up in price, you know, a thousand percent. . . . [W]e have all these distribution channels I'm going to introduce you to. . . .  [W]e are going to make a lot of money."  (Id. at 85:3-17.)  When asked whether Fink and Godard talked about any other terms of the potential agreement, Fink responded, "No.  I didn't talk any terms with him at all.  The only thing that I spoke to him about was all the things that he was

15

going to do for us once we got going." (Id. at 86:4-11.)  When asked where he left things with

Godard, Fink testified that he understood that Donofrio would "follow up" and "send [Fink] a

contract." (Id. at 89:9-16.)

Larry Caplen's testimony was consistent with Fink's testimony.  Caplen confirmed that

the purpose of the call was "to make sure . . . Brandon [Donofrio] had the authority to get

involved in a licensing agreement." (L. Caplen Dep. 111:16-21, Oct. 21, 2011.)  Caplen testified

that Godard talked about "who he was and how that could assist Legendary Art in its growth with

the people that he knew[,] . . . about the different galleries he was in across the country, . . .

[about how] he was extensive with the cruise lines and cruise ships. . . .  And he talked about the

possibilities of signing our pieces." (Id. at 112:23-114:18.)  Caplen confirmed that the parties to

the conversation did not discuss the terms of any written agreement, which Caplen understood

would be "hammered out with Brandon [Donofrio], who, in turn, would get Godard to sign off

on it." (Id. 117:3-19.)  Caplen testified, "although we didn't talk about terms of this contract

when it came to the building of the shadowboxes, it came to the feeling that, you know, this

agreement that we were going to get to was going to incorporate Godard also doing things for

Legendary Art." (Id. at 119:11-20.)

Defendants dispute the content of this conversation as stated by Legendary Art, but for

purposes of the present motion, do not offer a competing version of the exchange.  Rather,

Defendants argue that Legendary Art's evidence, taken as true, fails to establish the necessary

elements of an enforceable contract.  This court agrees.  See Boyd v. Cambridge Speakers Series,

Inc., 2010 WL 2545541, at *5 (E.D. Pa. 2010) ("Under Pennsylvania law, where the facts are in

dispute, the question of whether a contract was formed is for the jury to decide.  However, the

question of whether an undisputed set of facts establishes a contract is a matter of law.")
(quotation and citation omitted).

First, the conversation between Godard, Fink, and Larry Caplen, when viewed in the light most favorable to Legendary Art, amounted to preliminary negotiations which contemplated a further manifestation of intent.  Both men characterized Godard's statements not as an offer, but as the type of sales pitch that would precede the negotiation of contract terms:  Fink described Godard as "doing like a diarrhea mouth, . . . telling me all the things he was going to do for us" (Fink Dep. 84:23-85:2); and Caplen stated of Godard, "he just seemed to go on – he was a very, very likable and outgoing individual that wanted to, you know, I think sell us that we were making . . . the right move to go with him."  (L. Caplen Dep. 113:20-114:3.)  Indeed, both Fink and Larry Caplen testified that the purpose of the conversation was to confirm that Donofrio was Godard's agent, with whom Fink and Caplen would discuss the terms of the forthcoming agreement.  Both men testified that they did not discuss the terms of the agreement with Godard. Nothing in the interaction described by Legendary Art evidences an intent to be bound by either party.  Rather, the parties behaved as though they were engaged in negotiations, and not as if an agreement had been finalized.[3]

Second, the terms of the alleged oral agreement are too uncertain to constitute an enforceable contract.  Fink's and Larry Caplen's testimony regarding Godard's alleged promises

---

[3] The exchanged drafts of the more formal contract provides additional evidence supporting the conclusion that the parties did not intend the statements made by Godard during the telephone conversation to constitute a binding agreement.  The expanded agreement contained an integration clause, which was not altered in the markup returned by Legendary Art and containing proposed revisions.  (Defs.' Exs. M, N.)  Nor did Legendary Art's markup include any of the Personal Performance Obligations allegedly promised by Godard.  (Defs.' Ex. N.)

17

consists only of generalities.  Fink's most specific testimony was that "Michael [Godard] was going to introduce us into his galleries, do signings for us, introduce us to friends, connections, to get pieces sold, get us introduced in the marketplace."  (Fink Dep. 319:16-21.)  Larry Caplen was even less specific.  (L. Caplen Dep. 112:23-114:18.)

Even taking Legendary Art's answers to interrogatories as true, the terms of the alleged oral contract as stated therein are still too uncertain to enable this court to determine whether there was a breach and to craft an appropriate remedy.  For example, Legendary Art alleges that Godard promised to tell "all his friends and business associates about the shadow box products" and "[p]romot[e] the shadow box products to celebrities with whom he had personal friendships."  However, "all [Godard's] friends and business associates" and the "celebrities with whom [Godard] had personal friendships" are nowhere identified, leaving the court no way to determine whether Godard promoted Legendary Art's products to these unidentified people.  Similarly, Godard's alleged promise to "[o]rally promot[e] . . . and sign[] the shadow box products during special events throughout the United States and Canada, such as personal appearances and signing events at galleries" is too indefinite to be enforced.  "Orally promote" is not defined, nor is there any indication of what constitutes a "special event" or "personal appearance."  This vague statement does not include material terms, such as whether Godard must promote and sign Legendary Art's products at all public appearances, for an indefinite period of time, or, if not, how many, and for how long.

The terms alleged by Legendary Art are too uncertain to constitute an enforceable contract.  Moreover, the extent of the uncertainty further indicates that the parties did not intend to be bound by anything that was said during the February 2007 telephone conversation.  <u>See</u>

Chung v. Choi, 2008 WL 3852237, at *3 (E.D. Pa. Aug. 18, 2008) ("'[T]he more important the uncertainty, the stronger the indication is that the parties do not intend to be bound.'") (quoting Restatement (Second) of Contracts § 33 cmt. f).  Because the evidence, taken in the light most favorable to Legendary Art, demonstrates neither an intent to be bound nor sufficiently definite terms, no enforceable oral contract exists and Legendary Art's claim for breach of the Personal Performance Obligations must be dismissed.

d.     Parole Evidence Rule

Defendants argue that the parole evidence rule prevents Legendary Art from introducing evidence of the oral Personal Performance Obligations preceding the written Deal Memorandum. Because the court finds that the Personal Performance Obligations do not constitute an enforceable contract, the court need not address this argument.

**B.     Unjust Enrichment Claim**

In the Second Amended Complaint, Legendary Art has pled a cause of action for both breach of contract and unjust enrichment.  Defendants argue that Legendary Art's unjust enrichment claim must be dismissed because the existence of the Deal Memorandum as a valid written contract between the parties precludes Legendary Art from bringing a claim for unjust enrichment.  Legendary Art responds that its unjust enrichment claims is pled in the alternative to its breach of contract claim, and argues in the event that Defendants are successful in having claims based on the oral contract dismissed, Legendary Art should be able to recover under the quasi-contractual theory of unjust enrichment.

While the law in Pennsylvania supports Legendary Art's position, see Pa. R. Civ. P. 1020(c) (providing for the alternative pleading of causes of action); Lampl v. Latkanich, 231

19

A.2d 890 (Pa. 1967) (allowing plaintiff to proceed on breach of contract and unjust enrichment

claims), Defendants make a convincing argument that Legendary Art has failed to offer evidence

of any benefit that inured to Godard so as to support an unjust enrichment claim.  However,

viewing the evidence in the light most favorable to Legendary Art, there is some evidence

suggesting that Legendary Art introduced the Godard brand to various other potential licensees.

(See Pl.'s Exs. 29, 46.)  While it is questionable whether there is enough proof to support an

unjust enrichment claim, the claim should proceed to the jury and the court will entertain a

motion for a directed verdict on this issue, if appropriate.

        An implementing order follows.