IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEGENDARY ART, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL GODARD, et al. | : | NO. 11-0674 |

**MEMORANDUM AND ORDER**

Plaintiff in this case, Legendary Art, LLC ("Legendary Art"), brings claims of breach of contract and unjust enrichment against Defendants Michael Godard ("Godard"), Michael Godard Fine Art Enterprises, Inc. ("MGFA Enterprises"), Michael Godard Fine Art Associates ("MGFA Associates"), and Michael Godard LLC ("MG LLC").  Presently before the Court are Defendants' Motion to Exclude Expert Testimony (Doc. 37), Plaintiff's Response in Opposition thereto (Doc. 43), Defendants' Reply (Doc. 46), and Plaintiff's Sur-reply (Doc. 48).  Having considered the briefing, and the arguments presented by the parties during the hearing on July 27, 2012, for the reasons stated herein, Defendants' motion will be granted.

**I.    BACKGROUND**[1]

Legendary Art, in support of its damages theory, wishes to present the expert report ("Report") and testimony of John Allen Slocumb ("Slocumb"), of Compass Rose Advisors, LLC ("Compass Rose").  (See Defs.' Mot. to Exclude Expert, Ex. F.)  The Report is offered to "establish a range of fair market values for [Legendary Art] as of [February 8, 2007] as it relates to the lawsuit *Legendary Art, LLC v. Michael Godard, et al.*"  (Id., Ex. F at 2.)

---

[1] A complete recitation of the background of this case is set out in this court's Memorandum and Order on Defendants' Motion for Summary Judgment, filed concurrently with this opinion.

Defendants do not challenge Slocumb's qualifications, nor do they quarrel with his methodology. Rather, Defendants primarily argue that the data upon which Slocumb based the damages calculations in his report were unreliable, rendering his conclusions speculative and inadmissible.[2]

The Report relied upon a business plan developed by Legendary Art in early 2008 ("Business Plan") that contained profit and loss projections. (Id., Ex. F at 4.) According to the Report, Compass Rose "relied upon the Business Plan to form its valuation conclusions and assumed the validity of the Business Plan Projections." (Id., Ex. F at 7.) Further:

> For purposes of this report, Compass Rose Advisors, LLC assumed the validity of the projections and only reviewed them for reasonableness in light of the preparer's experience as a finance professional. For the sake of clarity, neither Compass Rose Advisors, LLC nor John Slocumb have experience in the manufacture, sale or distribution of artwork or related products.

(Id., Ex. F at 5.) It is undisputed that Slocumb and Compass Rose did not conduct any independent research into Legendary Art's industry, and the Report references no market surveys or studies. There is no evidence that Slocumb engaged in any independent verification of the projections supplied by Legendary Art.

The origins of the Business Plan's profit and loss projections are somewhat dubious. Legendary Art's corporate representative, Larry Caplen, testified that the projections were complied by himself, Legendary Art members Joel Fink and Salvatore Giordano, and two "financier[s]" from Maryland and Seattle whose names Caplen could not recall and who were

---

[2] Defendants make several other arguments regarding the propriety of Plaintiff's damages theory under Pennsylvania law. Those arguments are more properly considered as part of Defendants' motion for summary judgment, and are thus addressed in this court's Memorandum and Order on Defendants' Motion for Summary Judgment.

2

never identified in discovery. (Caplen Dep. 291, 338, Dec. 16, 2011.) No communications between Legendary Art and the financiers were maintained by Legendary Art. (Id. at 343-45.) Caplen could not specify on what basis, or by whom, the profit projections were generated. (Id. at 309-311.)

Legendary Art points to Salvatore Giordano, whom it asserts "developed the profit and loss projections used in the business plans." (Pl.'s Resp. 5.) Giordano's testimony offered few specifics as to how the projections were generated. Asked repeatedly during his deposition how he had generated the profit and loss projections, Giordano repeatedly answered that he relied upon his "understanding [of] the business" or some variation thereof – "understanding [the] markets," "what I know in the industry," "understanding what the market potential is," "understanding what an agreement does for you, based on my history in the business world" – and could not articulate a method or point to any concrete research he or Legendary Art conducted. (See Giordano Dep. 139-161, Jan. 17, 2012.)

However, in an affidavit generated after his deposition and in response to the Defendants' motion, Giordano provided additional information. (See Pl.'s Resp, Ex. 51.)[3] There, Giordano states that he "constructed the profit and loss forecasts in [Legendary Art's] business plans" based on "historical performance in sales growth as well as an informed assessment of where our

---

[3] Defendants urge this court to disregard Giordano's affidavit. They argue that the affidavit conflicts with Legendary Art's testimony via its 30(b)(6) corporate designee. Defendants further argue that the affidavit should be stricken under the "sham affidavit" doctrine, because it is an after-the-fact sworn statement that contradicts Mr. Giordano's deposition testimony. Defendants arguments may well have merit. However, the court finds that, even if it considers the Giordano affidavit, Plaintiff's expert still would not survive a Daubert challenge. Thus, the court will not reach the merits of Defendants' arguments regarding the legitimacy of the affidavit.

sales would go in the future." (Id., Ex. 51 at ¶ 27.)  According to the affidavit, Legendary Art's "historical performance" consisted of three years of sales history, during which it had "roughly doubled sales each year from $110,000 in 2004 to $210,000 in 2005 to $379,000 in 2006." (Id., Ex. 51 at ¶ 21.)  Giordano estimated that Legendary Art could do "in excess of $10 million in sales" before saturating the market, but offered no detail regarding how that number was determined or how the company planned to increase its production and sales to reach that goal. (Id.)  The "assessment of where our sales would go in the future" was based on two sources: first, "information gathered at the many trade shows in which Legendary Art participated" of which Giordano named eleven (id., Ex. 51 at ¶ 16); and second, "trade and industry publications" of which he named five (id., Ex. 51 at ¶ 17).  He offered no specifics as to what, if any, data was collected or analysis was conducted based on these sources.  Giordano also listed Legendary Art's "distribution channels," including generalizations such as "[a]rt galleries nationwide," but did not indicate whether Legendary Art had contracts for distribution with these distributors, or whether or how Legendary Art calculated the potential volume of sales it expected to accomplish through each channel.  (Id., Ex. 51 at ¶ 22.)

      From this information, Giordano concluded that Legendary Art could "increase sales at a similar pace of roughly doubling sales each year for at least several more years." (Id., Ex. 51 at ¶ 21.)  He further concluded that "the potential market for Legendary Art's products generally was well over $1 billion domestically." (Id., Ex. 51 at ¶ 21.)  It was apparently on these assumptions that Giordano based the profits and loss projections in the Business Plan, which project sales of $1.5 million in 2009, $3 million in 2010, $6 million in 2011, and $10 million in 2012.  The

projections show accompanying profit forecasts of $449,507 in 2009, $1,319,775 in 2010, $3,165,625 in 2011, and $5,610,025 in 2012.

## II. LEGAL STANDARD

Pursuant to Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), it is the responsibility of the trial judge to serve as a "gatekeeper" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable."[4] Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997). A District Court is granted wide discretion when determining whether to admit or exclude expert testimony. Hamling v. United States, 418 U.S. 87, 108 (1974). The proponent of the expert testimony must meet this burden "by a preponderance of proof." Oddi, 234 F.3d at 144 (quoting Daubert, 509 U.S. at 593).

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). A trial court must exclude expert testimony that does not meet these three

---

[4] Daubert was decided in the context of scientific knowledge; however, it has since been extended in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), to "technical or other specialized knowledge." Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000).

requirements.  Id. at 404 (citing Daubert, 509 U.S. at 592).  Principally at issue here is the second requirement, reliability.  Under this requirement, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."  Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994).  To be "reliable," the testimony must be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation."  Paoli, 35 F.3d at 742 (citing Daubert, 509 U.S. at 590).  "The evidentiary requirement of reliability is lower than the merits standard of correctness."  Id.  In other words, a litigant need not prove that an expert's opinions are *correct*, she need only prove that they are *reliable*.  Id.

While an expert's methodology must be reliable under Rule 702, the data underlying the expert's opinion must satisfy the reliability requirements imposed by Rules 104[5] and 703.[6]  According to the Third Circuit, "the standard is equivalent to Rule 702's reliability requirement – there must be good grounds on which to find the data reliable."  Paoli, 35 F.3d at 748.  Moreover, the Third Circuit has made clear that "it is the judge who makes the determination of reasonable reliance" on underlying data, and that to make such a determination, "the judge must conduct an

---

[5] Under Rule 104, "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  Fed. R. Civ. P. 104(a).  Further, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."  Id. at 104(b).

[6] Under Rule 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Fed. R. Civ. P. 703.

independent evaluation into reasonableness." Id.  "If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded."  Id. (quoting In re Agent Orange Prod. Liab. Litig., 611 F. Supp. 1223, 1245 (E.D.N.Y. 1985)).

### III.   DISCUSSION

Mr. Slocumb's opinions contained in the Report are unreliable and do not rest on good grounds.  He hypothesized that, but for the breach of the contracts with the Defendants, Legendary Art would have been worth $270,000 on the low end, and $7,100,000 on the high end. (Defs.' Mot. to Exclude Expert, Ex. F at 10.)  There is no dispute that the profit and loss projections supplied by Legendary Art in the Business Plan are the linchpin of Mr. Slocumb's opinion.  His report states that his conclusions "are predicated upon successful implementation of the Business Plan" (id., Ex. F at 4), and that Legendary Art's losses would not have occurred "[h]ad the Business Plan been executed as expected" (id., Ex. F at 10 ).  There is no evidence that Mr. Slocumb did anything to verify these profit and loss projections.  Indeed, his report states several times that his analysis "assumed the validity of the projections." (Id., Ex. F at 5, 7.) Moreover, there is no evidence that Mr. Slocumb had any familiarity with the methods or reasoning used by Legendary Art to arrive at the projections.

Mr. Slocumb's reliance on projections supplied by Legendary Art, without independent verification, renders his analysis unreliable.  As another court in this district has stated, the rationale of Rule 703 "is certainly not satisfied . . . where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who

had a financial interest in making an accurate prediction." ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc., 249 F. Supp. 2d 622, 695 (E.D. Pa. 2003) (quoting TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993)). In TK-7 Corp., the expert's opinion, based on sales figures in a market study compiled by outside consultants at the behest of the company, was deemed unreliable. TK-7 Corp., 993 F.2d at 732-33. In ID Security Systems, the court found that the expert was even more unreliable because he based his opinion on projections supplied by the plaintiff company's president. Indeed, the court reasoned that ID Security's president had more incentive than the TK-7 Corp's independent consultant to inflate the predictions of the company's potential sales and profits. ID Sec. Sys. Can., Inc., 249 F. Supp. 2d at 695.

      The same is true in the instant case. The Business Plan was a document created by Legendary Art and supplied to Mr. Slocumb. Even more problematic, as detailed above, Legendary Art has failed to offer any evidence regarding the development of the Business Plan or the basis for the profit and loss projections therein. Legendary Art's claims of "market research" are not supported by a single study, analysis, calculation, or document of any kind. Thus, the Business Plan projections constitute precisely the sort of "subjective belief or unsupported speculation" that renders an expert's opinion inadmissible under Rules 702 and 703. Paoli, 35 F.3d at 742 (citing Daubert, 509 U.S. at 590); see also Zenith Elec. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 420 (7th Cir. 2005) (affirming exclusion of damages expert who relied upon plaintiff's internal profit projections, which "represent hopes rather than the results of scientific analysis"); Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc., 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding damages expert who used "untested, and unverified marketing projections [as] the foundation of a damages calculation").

Legendary Art cites a number of cases that stand for the proposition that the propriety of sources upon which an expert relies generally goes to the weight and not the admissibility of the evidence, and is therefore a question to be considered by the jury.  However, Mr. Slocumb's "lack of familiarity with the methods and reasons underlying . . . [Legendary Art's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination."  ID Sec. Sys. Can., Inc., 249 F. Supp. 2d at 695 (quoting TK-7 Corp., 993 F.2d at 723).  Although Mr. Slocumb said that he reviewed the projections for "reasonableness,"[7] he qualified that statement by disclaiming any "experience in the manufacture, sale or distribution of artwork or related products."  (Defs.' Mot. to Exclude Expert, Ex. F at 5.)  Other courts in this district have weighed an expert's lack of familiarity with the industry upon which he is opining against him, particularly where, as here, the expert made no attempt to perform any research into the industry.  See JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc., No. 97-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998).  In JMJ Enterprises, the court excluded an expert who "knew very little about [the plaintiff's] industry."  Id. at *7.  There, as here, the expert "did not perform or review any market surveys or studies" and "did not conduct or review any research on the

---

[7] Mr. Slocumb's review for "reasonableness" – made up only of generalities about the early developments of businesses without any specific analysis of Legendary Art – is itself questionable.  For instance, Mr. Slocumb finds that Legendary Art's growth projections are "not unreasonable" because "[m]any companies experience exponential growth in the early stages due to such strategies as aggressive sales practice and extensive management focus on growth objectives." (Defs.' Mot. to Exclude Expert, Ex. F at 7.)  Mr. Slocumb is tellingly silent, however, with respect to whether Legendary Art was such a company or employed such strategies.  Similarly, Mr. Slocumb notes that "early-stage companies can be impacted disproportionately by a single sale or business relationship."  (Id., Ex. F. at 7.)  Was Legendary Art one such company, and was its relationship with the Defendants one such relationship?  Mr. Slocumb does not say.  Nor could he, because, as he notes, "[t]here was no breakout in the Business Plan Projections between sales of Godard-related product vs. non-Godard-related products."  (Id., Ex. F. at 7.)

[plaintiff's] industry or like businesses." Id.

Unverified profit and loss projections cannot be the type of evidence "*reasonably* relied upon by experts" as required by Daubert and the Federal Rules of Evidence, see Paoli, 35 F.3d at 748, particularly where the expert professes no experience in the plaintiff's industry. Here, the court is faced with the opinion of an expert who has no knowledge of the relevant industry, relied exclusively on the self-serving data provided by Legendary Art, and conducted no independent verification of that data. Such an opinion simply does not meet the standards of reliability required by Rules 104(a), 702 and 703 and cannot be admitted.

## IV. CONCLUSION

For the foregoing reasons, Mr. Slocumb's opinion fails to satisfy the requirements imposed by Daubert and the Federal Rules of Evidence, and must therefore be excluded from this case.

An implementing order follows.